IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TINY HORN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 20 C 6231 |
| ) | |
| RYDER TRUCK RENTAL, INC., ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

This is a lawsuit in which the plaintiff, Tiny Horn, seeks to recover for injuries she alleges she suffered while working for a company called CTDI. Horn has sued Ryder Truck Rental, Inc. and Comcast of Illinois XI, LLC. The case was removed from state court based on diversity of citizenship. Horn originally named a different Comcast entity, and when she amended her complaint to include the current Comcast defendant, there was a question regarding diversity of citizenship, which the defendants promptly cleared up. *See* Dkt. no. 29.

Comcast settled with Horn and was dismissed out of the case following a good faith finding under the Illinois Contribution Among Joint Tortfeasors Act. Ryder has moved for summary judgment. The Court deals with that motion in this order.

The historical facts do not appear to be in dispute, at least for present purposes. Horn drove a truck for CTDI, a local freight hauling company. She picked up refurbished and returned equipment from Xfinity stores; Xfinity is a Comcast trademark.

CTDI leased trucks, including the one Horn drove, from a company called Atlas, which Ryder acquired. CDTI and Atlas/Ryder (which the Court will refer to as Ryder from here on in) had a written lease and service agreement governing CTDI's rental of trucks. The Court will return to the agreement's terms in a bit.

Horn was injured on January 21, 2019. On that day, she was assigned truck number 515835. She had previously driven that same truck at least fifteen times. The truck had a lift gate at the rear that, via operation of a switch, would move up and down to enable loading carts or other items onto the truck. The gate has a feature called a "cart stop." A cart stop is a metal flap toward the rear of the lift gate. Its purpose is to prevent loads sitting on the lift gate from shifting or rolling back as the gate rises. The cart stop pops up when activated by a switch.

Horn testified that on August 25, 2018, she wrote up truck 515835 on her driver report and submitted a complaint to her supervisor at CTDI. The report/complaint has not been located despite a subpoena to CTDI. In the report, Horn says, she stated that the truck had a broken cart stop on its lift gate; it was bolted down with a washer and would not pop up. According to Horn, the cart stop was never repaired despite her complaint. Horn says that at some point between August 25, 2018 and January 21, 2019, she offered to drive the truck to Ryder to get it fixed, but she was told by someone at CTDI that the company did not want to have to pay for that.

There is no evidence that CTDI or anyone else told Ryder about Horn's report or the allegedly broken condition of the cart stop at any time before January 21, 2019. Horn drove the same truck several more times before January 21. She says that on these occasions, when she had to use the lift gate, someone from Comcast would help

her load the truck: one person would operate the switch that caused the gate to rise or drop, and the other would hold the cart to make sure it did not roll off the lift gate. Horn did not submit any other reports to CTDI regarding the gate on any of the occasions after August 25, 2018 on which she drove truck 515835. She says that she told her bosses about the lift gate verbally (after August 25) and was told to use a "wheel chock," which is a block typically used to keep a truck wheel from moving. Horn says this does no good on the lift gate, as a wheel chock does not fit under the wheels of the carts used on the lift gate.

     Ryder's records reflect that it inspected the lift gate on truck 515835 on twelve occasions from January 2014 through August 15, 2018. Ryder's records reflect that on August 15, 2018, the lift gate was checked off as "okay," and no condition of defect or disrepair was found. Ryder's records do not reflect any further inspections of the lift gate specifically after August 15 and before January 19, 2019. Ryder's records do reflect that it inspected truck 515835 on other occasions, including on December 18, 2018, after Horn says she reported the defect in the cart stop. A representative of Ryder who does not appear to have been involved in that inspection but who testified about company practice stated that if a repair was needed on the lift gate or cart stop, that would have been reflected in the company's records. There was no such indication in the records, and also no indication of any repairs to the lift gate or cart stop from August through December 2018.

     On January 21, 2019, Horn drove truck 515835 to a Comcast store in Schaumburg, Illinois. She had a large load to pick up there. The load was in one or more carts, which she says was or were over-filled. A Comcast manager helped her

3

move a filled cart to the ramp where her truck was located. The ramp was on an incline. Horn says the cart stops on the truck's lift gate were still bolted down and thus could not be used. On that day, no one from Comcast offered to help her load the truck. Horn says she tried to hold the cart and operate the lift gate switch on her own, but when the lift gate was halfway up, the cart started sliding off, and although she tried to hold it, it was too heavy and kept moving. Horn says she felt a sharp pain in her shoulder. The cart "went down," and the equipment fell out. Several Comcast employees came out and helped pick up the fallen equipment, put it back into the cart, and load it into the truck.

The truck was not taken to Ryder for any repairs to the lift gate after January 19. Ryder next saw the truck on February 6, 2019, for a service call to repair the switch and wiring for the lift gate, which apparently was not going back up. The repair was done on February 25. There is no indication in Ryder's records that any problem with the cart stop was observed.

In this lawsuit, Horn asserts three separate claims: for negligence, *res ipsa loquitur* (which isn't really a separate claim), and strict liability. In response to Ryder's summary judgment motion, she has withdrawn all but the negligence claim.

The principles underlying the negligence claim do not appear to be disputed. Under Illinois law, which governs, a plaintiff claiming injuries due to negligence must establish the existence of a duty of care owed by the defendant to the plaintiff; breach of that duty; and injury proximately caused by the breach. *See, e.g., Hutchison v. Fitzgerald Equip. Co.*, 910 F.3d 1016, 1022 (7th Cir. 2018); *Ward v. K Mart Corp.*, 136 Ill. 2d 132, 140, 554 N.E.2d 223, 226 (1990). Regarding the existence of a duty, the

ultimate question is whether the defendant and the plaintiff stood in such a relationship that the law imposed on the defendant an obligation of reasonable care for the benefit of the plaintiff. *Hutchison*, 910 F.3d at 1022. The existence of a duty is typically an issue of law, but sometimes it depends on underlying facts, and if those facts are disputed the trier of fact must resolve them. *See, e.g., Zaccariello v. United Maint. Co.*, 2014 IL App (1st) 131135-U, ¶ 33, 2014 WL 2168472, at *7; *Jones v. O'Brien Tire and Battery Serv. Ctr., Inc.*, 374 Ill. App. 3d 918, 933, 871 N.E.2d 98, 112 (2015).

One situation in which a duty to warn of a dangerous condition exists is if there is unequal knowledge; the defendant has actual or constructive knowledge of a dangerous condition; and the defendant, having such knowledge, knew or should know that harm might result absent a warning. *Id.* The evidence does not support imposition of a duty here on this basis. Horn knew about the alleged condition of the lift gate. Ryder says it didn't, but even if constructive knowledge might be inferred (as discussed below), one could not reasonably infer that Ryder had any more knowledge of the condition of the cart stop's condition than Horn did. In short, there is no evidence of *unequal* knowledge on the part of Ryder vis-à-vis Horn.

Another basis on which Ryder might be liable is the voluntary undertaking theory of liability, which Illinois recognizes. "[A] party to a contract may be liable in tort to a third party who otherwise has no enforceable rights under the contract under a voluntary undertaking theory of liability." *Hutchison*, 910 F.3d at 1023. Under this theory, a party may be liable if it:

> (a) . . . undertakes to do something and then fails to exercise reasonable care in a way that increases a third party's risk of harm; (b) . . . undertakes to perform a duty that a different third party was obligated to perform and

5

> then negligently fulfills its duty; or (c) a third party relies to its detriment on the fact that a duty has been voluntarily undertaken.

*Id.* (internal quotation marks omitted) (citing *LM ex rel. KM v. United States*, 344 F.3d 695, 701 (7th Cir. 2003)). In this case only alternative (a) is involved.

When the voluntary undertaking theory of liability is invoked, "the duty of care to be imposed upon a defendant is limited to the extent of its undertaking." *Hutchison*, 910 F.3d at 1024 (citing *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32-32, 605 N.E.2d 557, 560 (1992)). Ryder contends that its duties in this regard are limited by its contract with CTDI. Ryder further contends that under the contract it undertook to repair only defects and conditions that CTDI brought to its attention.

The truck lease and service agreement between Atlas (Ryder) and CTDI includes the following provisions, which Ryder quotes in its brief in describing its contention regarding the scope of its voluntary undertaking:

> 10. ATLAS SERVICES. Atlas agrees, at its own cost and expense, to provide the following with respect to vehicles leased hereunder, and any substitute vehicles covered by this lease:
>
> . . .
>
> (c) Maintain said vehicles in good repair, mechanical condition and running order.
>
> . . .
>
> Atlas' obligation to furnish those services hereinabove referred to is expressly conditioned upon the punctual payment and discharge by Customer [CTDI] of all of its obligations under the lease.
>
> . . .
>
> 14. INSPECTION AND REPAIRS. Customer [CTDI] shall deliver to the garage maintained by Atlas for the respective vehicle, or as otherwise directed by Atlas in writing, all vehicles needing repairs or such vehicles as shall be requested by Atlas for inspection, necessary repairs

6

>or maintenance.  Notwithstanding the foregoing, Customer shall deliver each vehicle to Atlas for inspection, repair and maintenance a minimum of 8 business hours each week.
>
>Customer agrees not to cause or permit any person other than Atlas or persons expressly authorized by Atlas to make repairs or adjustments to vehicles, governors and other accessories, but shall in all cases of trouble give prompt notice to Atlas by the speediest means of communication available, give a description of the nature of the trouble and location of the vehicle. Customer's drivers shall abide by Atlas' directions concerning emergency repairs, and shall at the end of each day note on forms provided by Atlas any and all faulty operations, which he has experienced with that vehicle. Except as so reported, it shall be conclusively presumed that said vehicle operated satisfactorily . . .

Def.'s Ex. D ¶¶ 10, 14.  Ryder relies on the last three sentences of paragraph 14, which it appears to interpret as limiting any contractual obligation to repairing conditions brought to its attention by CTDI.

The Court disagrees, at least for purposes of the motion for summary judgment.  The portions of paragraph 14 cited by Ryder certainly required CTDI to give it notice of any problems with the truck, but those three sentences don't describe the entirety of what Ryder undertook to do in the lease and service agreement.  In paragraph 10, Ryder undertook to "[m]aintain [the] vehicle[ ] in good repair, mechanical condition and running order."  Ryder seems to read paragraph 10 as limited to resolving any problems brought to its attention by CTDI under paragraph 14, but that's not how paragraph 10 is written.  Rather, Ryder affirmatively undertook in paragraph 10 to maintain the truck in good repair and mechanical condition.  And the evidence indicates that's exactly how Ryder itself read the contract:  it conducted regular inspections of the trucks, including the particular truck that Horn drove.  That basic fact of life in the Ryder-CTDI relationship would be effectively meaningless—essentially a waste of time—if the only obligation Ryder undertook was to repair problems specifically brought to its attention by

7

CTDI. And to the extent there's an ambiguity in the agreement in this regard, it's construed against Ryder, which pretty clearly drafted the contract. *See, e.g., Tranzact Techs., Ltd. v. Evergreen Partners, Ltd.*, 366 F.3d 542, 546 n.2 (7th Cir. 2004). The Court concludes that Ryder is not entitled to summary judgment on the claimed basis that its voluntary undertaking is limited to repairing conditions brought to its attention by CTDI.

On the question of breach of duty, a reasonable jury could infer that if the cart stop was bolted down as Horn claims, it would have been discovered via an inspection, thus giving Ryder constructive notice of the defective and potentially dangerous condition. One would assume that Ryder's contention is that the cart stop was *not* bolted down, at least not at the relevant time, and that Horn is making this up or remembering it wrong. Ryder might well prevail on that basis (or some other basis) at trial. But it is not entitled to summary judgment.

## Conclusion

For the reasons stated above, the Court denies defendant Ryder Truck Rental, Inc.'s motion for summary judgment as to count 1 of plaintiff's complaint (negligence). Counts 2 and 3 are voluntarily dismissed. The case is set for a telephonic status hearing on March 20, 2023 at 8:55 a.m. to discuss the scheduled trial date of May 8, 2023 as well as the possibility of settlement. The following call-in number will be used: 888-684-8852, access code 746-1053.

Date: March 14, 2023

_____
MATTHEW F. KENNELLY
United States District Judge

8